Weitershausen Agency, Appellant, *v.* Morgan.

Argued March 19, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and McBRIDE, JJ.

*John B. Nicklas, Jr.,* with him *McCrady & Nicklas,* for appellant.

*Peter Cooper,* for appellee.

OPINION PER CURIAM, May 8, 1959:

The judgment is affirmed on the opinion of President Judge SNYDER for the Court en banc.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

A judge who unjustly censures a lawyer trying a case before him prejudices the cause of the lawyer's client in the eyes of the jury and thus works a harm which is frequently as irreparable as it is inexcusable.

In the present case the plaintiff's attorney was questioning a Mr. Hacke with regard to a telephone conversation he had had with Mrs. Morgan, the defendant, who at the time was in Beaufort, South Carolina. There was some testimony about an offer of $113,000 for some real estate, and then the following ensued: "Mr. Nicklas: Q. Then what did you do after that first

conversation about the $113,000.00? A. I immediately called my buyer and told him that he better bring his price up to the full asking price because I felt—the Judge said to strike it from the record, but I told my buyer that I thought we were being used. Q. You are not allowed to say that. The Court: The jury will disregard the statement, and you will not make that statement again, sir. You knew he was going to make the statement, Mr. Attorney, didn't you? Mr. Nicklas: Your Honor, I don't think the Court should say that to me and I resent that. I don't think that is proper for the Court to make that statement. I did not know what he was going to say. The Court: Just a moment, please. He made the statement a moment ago and you were leading up to it again and you know it shouldn't have been stated; is that correct? Mr. Nicklas: That is not correct, your Honor. The Court: You should have cautioned him. Now what do you want to do next? You should have known he was going to make that statement and you could have guided him on it."

There is nothing in the record to remotely suggest that as the judge charged, Attorney Nicklas knew that the witness was going to make the objectionable statement. Nor is there anything in the record to show that the judge was endowed with clairvoyant powers which enabled him to read the lawyer's mind. The judge's remark was critical and petulant.

After Mr. Nicklas explained he did not know what the witness would say, the judge insisted that the lawyer should have known what the witness *intended* to say. There was no crystal ball on the counsel table to give support to the judge's accusation that Mr. Nicklas could, by some black magic, anticipate the witness's answer. Since, therefore, a supernatural communication has to be ruled out, the only possible inference which one could derive from the judge's remark

is that the attorney had planned with the witness to get him to give improper testimony and thus work a deception on the jury.

And, once the jury gets the idea that a lawyer is practising a chicanery, his presence in the courtroom from that moment can be of no help to his client.

It is probable that the Trial Judge did not realize the breach he made in the plaintiff's case by his intemperate remark, but it is not for us to excuse the judge at the expense of justice. Judges sit on a higher level than other participants in a courtroom contest because it is assumed that by training, study, and temperament they are above petty anger and trivial irritation. But when a judge scolds a lawyer or a witness without reason, he falls from the plateau of respect and becomes a wrangler in the public square. Judges should preside over trials with Olympian detachment and not with Madison Square Garden involvement. A judge should guide, not strike; he should advise, not argue; he should instruct, not debate; he should direct the proceedings with an olive branch, not with a club; he should traverse the terrain of controversy with meditation and not leap at half-considered conclusions; he must be firm, but not tyrannical. Americans do not take kindly to despotism, whether it wear a crown or a black robe or thunders at the door at night.

Of course, it may well be that in all other trials presided over by the present judge he was the quintessence of wisdom and the apogee of courtesy, and possessed all the judicial qualities ascribed to King Solomon. But we can only be concerned with the case before us, and decide whether on the particular day of the controversy he sat on the seat of impartial judgment or strayed away to take a commanding position in the arena of partisan dispute.

It is entirely possible that the judge's ire as it appears in the incident related, and as also manifested on a later occasion (which it is unnecessary to relate) did the plaintiff no harm. It may be that the jury might have found for the defendant anyway. On the other hand, it could be that when the judge accused the plaintiff's attorney with scheming and conniving to hoodwink the jury, a verdict in behalf of the plaintiff became impossible. With such a possibility in the case I cannot believe that the plaintiff was afforded the fair trial to which he was entitled. I, therefore, for that reason would order a new trial.

Mr. Justice McBRIDE concurs in this dissent.